IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 10-23728-CIV-O'SULLIVAN

[CONSENT CASE]

BISCAYNE COVE CONDOMINIUM ASSOCIATION INC.
A Florida corporation,

       Plaintiff,

v.

QBE INSURANCE CORPORATION
A Pennsylvania corporation,

       Defendant.
_____/

**PLAINTIFF BISCAYNE COVE CONDOMINIUM ASSOCIATION'S REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, Biscayne Cove Condominium Association ("Biscayne Cove) pursuant to this Court's Order at D.E. 144, hereby serves its revised proposed findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

1.    When Hurricane Wilma struck South Florida, Biscayne Cove was insured under QBE insurance policy QF2862-07.

2.    Hurricane Wilma struck South Florida on October 24th, 2005.

3.    There is no dispute Hurricane Wilma caused damage to Biscayne Cove's insured property, including damage to both of the main building's roofs and at least some windows providing access to the individual condominium units.

4.    On October 26, 2005, Biscayne Cove notified QBE that it sustained a loss caused by Hurricane Wilma via an "Acord Property Loss Notice" form.

5. Florida Intracoastal Underwriters is QBE's managing general agent was ultimately responsible for the adjustment of Biscayne Cove's claim on behalf of QBE, in 2005 and at present.

6. Florida Intracoastal Underwriters retained an outside adjusting firm named Interloss to inspect Biscayne Cove's property and to adjust the loss on QBE's behalf.

7. Robert Sansone is a licensed insurance adjuster and the owner of Interloss. Interloss contracts with Florida Intracoastal Underwriters.

8. QBE and FIU relied on Robert Sansone and Interloss to determine the amount of Biscayne Cove's insured loss.

9. Mr. Sansone observed and documented damage to both of Biscayne Cove's buildings including but not limited to damage to both of the two main building's at Biscayne Cove's roofs. These buildings are referred to as the "Tower Building" and the "Clipper Building."

10. On March 2nd 2007, QBE closed Biscayne Cove's claim without payment.

11. A Florida Intracoastal Underwriter's business record that was admitted into evidence as Plaintiff's Exhibit 7 notes that as of October 6th, 2006, nearly one year after the hurricane, Mr. Sansone was "working to finish inspection and estimate."

12. A different Florida Intracoastal Underwriters document admitted into evidence as Plaintiff's Exhibit "8" dated March 2nd, 2007 notes that "we have completed the inspection with the insured's public adjuster" and concludes that the amount of Biscayne Cove's claim is less than the deductible and the claim would therefore be closed without payment.

13. During trial Mr. Sansone testified that he made verbal requests of Biscayne Cove's public adjuster for access to various units and copies of various documents relating to the claim, but that Biscayne Cove never complied with these requests.

14. Mr. Sansone did not assert that Biscayne Cove refused to comply. He simply maintained that they failed to respond.

15. Mr. Sansone admitted that none of these requests were made in writing and there are no contemporaneous notes documenting that these requests were ever made.

16. Mr. Sansone explained the lack of any documentation reflecting the requests he claims to have made was due to the fact that he was extremely busy handling a large number of claims and therefore neglected to reduce these requests to writing or otherwise make any contemporaneous notes documenting these verbal requests.

17. Mr. Sansone admitted during trial that his testimony that he had requested documents and inspections from Biscayne Cove that were never provided was based entirely on his recollection of events that occurred six or seven years earlier.

18. Nobody acting on behalf of QBE advised Biscayne Cove that its claim would be closed without payment, or sent any written correspondence to Biscayne Cove at any time, including when the claim was closed.

19. Andy Bertucci is the Florida Intracoastal Underwriter's adjuster currently responsible for Biscayne Cove's claim. He testified as QBE's corporate representative at trial.

20. Mr. Bertucci testified that he first learned of the requests that Mr. Sansone claims to have made in March of 2013, more than six years after the claim was closed without payment and well over two years after this lawsuit was filed.

21. It is therefore undisputed that QBE and Florida Intracoastal Underwriters were not aware of Mr. Sansone's contention that there were outstanding request for documents or inspections when Biscayne Cove's claim was closed in 2007.

22. The Court rejects Mr. Sansone's testimony that he requested documents and inspections before the claim was closed without payment as incredible. Mr. Sansone's explanation that he was too busy to make these requests in writing, or to document that he had been unsuccessful in obtaining access to Biscayne Cove's building or copies of relevant documents is insufficient.

23. It is difficult to believe that Mr. Sansone could clearly and accurately remember conversations he claims to have had more than six years ago, particularly since he also claims he was unusually busy at that time.

24. Furthermore, Plaintiff's Exhibits 7 and 8, and Mr. Bertucci's own testimony establish that Florida Intracoastal Underwriters was completely unaware of any unsatisfied request as of the time that the claim was closed in March of 2007. The fact that the entity ultimately responsible for the claim decision was unaware of the alleged requests is further evidence that these requests were not actually made.

25. On October 18th, 2010, Biscayne Cove sent a letter to QBE invoking the appraisal provisions of the insurance policy and identifying Rick Moore as its appraiser. Also on that date, Biscayne Cove filed this lawsuit.

26. On March 16th, 2011, this Court entered an order staying the proceedings in this case. (D.E. 32).

27. The stay was lifted on August 10th, 2012. (D.E. 37).

28.     During the 17 month period that the case was stayed, QBE did not request any information from Biscayne Cove relating to the claim or otherwise make any effort to adjust the claim.

29.     The case proceeded to trial on Biscayne Cove's Second Amended Complaint. That pleading, as well as the two prior versions, all contained a count seeking declaratory relief establishing that windows and sliding glass doors that provide access to the individual condominium units are covered under the subject insurance policy.

30.     In response to an interrogatory served by Biscayne Cove in February 2013, QBE acknowledged that Biscayne Cove's windows and sliding glass doors providing access to the individual units were covered under the subject insurance policy, and the count seeking a declaration of coverage for these building components was ultimately dismissed as moot.

31.     QBE maintains that Mr. Sansone considered did not exclude windows and sliding glass doors from his analysis, recognizing that those items were covered under the subject insurance policy.  Both Madeline Giardello, Biscayne Cove's president, and Oliver Gross, Biscayne Cove's treasurer, testified that, when the claim was closed without payment in 2007, the members of Biscayne Coves' board of directors were under the impression that windows and sliding glass doors were not covered under the QBE insurance policy.

32.     Mr. Moore began working with Biscayne Cove in 2010, at that time he informed Biscayne Cove that there has been litigation in other cases involving QBE condominium associations where QBE's denial of coverage for windows and sliding glass doors was rejected.

33.     In fact, in both *Mayfair House v. QBE Ins. Co*., 2008 WL 4097663 (S.D. Fla. August 29th, 2008)(Docket Number 08-80628) and *Royal Bahamian Ass'n. v. QBE Ins.* Co., 750 F.Supp.2d 1346 (S.D. Fla. 2010), QBE denied coverage for unit owners windows and sliding

glass doors that were damaged by Hurricane Wilma. Both of these cases determined that QBE's denial of coverage for these building components was invalid.

34. There is no evidence that QBE ever told any of Biscayne Cove's representatives that windows and sliding glass doors were included in QBE's evaluation of Biscayne Cove's claim. In fact, QBE never shared its own evaluation of the claim with Biscayne Cove or informed Biscayne Cove as the reason why the claim would not be paid.

35. Notably, QBE chose not to call Dick Tutwiler, who was Biscayne Coves' public adjuster at the time that the claim was closed without payment in 2007. Accordingly, the record is silent as to whether Mr. Tutwiler included windows and sliding glass doors in his evaluation of Biscayne Cove's claim.

36. Although the issue of whether QBE denied coverage for windows and sliding glass doors is no longer before the Court, it is relevant to understanding the sequence of events. The primary dispute between the parties concerning the underlying claim turns on whether there was extensive damage to the windows and sliding glass doors caused by Hurricane Wilma.

37. Section 626.9541(i)3.f, Florida Statutes provides that an insurer's failure to "…promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement" is an unfair insurance trade practice. Had QBE provided Biscayne Cove with a written explanation as to why its claim wasn't paid in 2007, there would be no question today concerning whether QBE included the windows and sliding glass doors in its evaluation of Biscayne Cove's claim.

38. The Court accepts Madeline Giardello and Oliver Gross's testimony that, until they met Mr. Moore, they believed that QBE intentionally refused to consider the damage to

6

their windows and sliding glass doors because it took the position at that time that the windows and sliding glass doors were not covered under the subject insurance policy. Since the parties agree that, without the windows and sliding glass doors, the amount of the claim would be close to the deductible, QBE's apparent denial of coverage for the windows and sliding glass doors explains why Biscayne Cove acquiesced to QBE's decision to close the claim in 2007. This also explains why Biscayne Cove became interested in reopening the claim once it learned in 2010 that that QBE had been unsuccessful in defending its position in litigation.

39. On behalf of Biscayne Cove and in conjunction with Mr. Moore, two different companies (Taylor Contracting and Roofing and WindReady) prepared an estimate that Biscayne Cove intended to use for purposes of the requested appraisal. These estimates describe millions of dollars in repairs for damage that Biscayne Cove attributes to Hurricane Wilma. These estimates were admitted as Plaintiff's Exhibit 1.

40. Email correspondence between counsel admitted as Plaintiff's Exhibit 2 demonstrates that Biscayne Cove provided these estimates to QBE, through defense counsel, on January 6th, 2012.

41. Mr. Moore's unchallenged testimony established that although the Taylor and WindReady estimates were far above the deductible and much higher than QBE's evaluation of Biscayne Cove's claim, the only difference in the scope of Biscayne Cove's estimate was that it contemplated a full replacement of all of the windows and sliding glass doors in both the Tower Building and the Clipper Building, and a complete replacement of the Tower Building roof.

42. Mr. Moore explained that Mr. Sansone's notes also documented damage to the Tower Building roof, but also show that Sansone concluded that damage could be repaired. Mr.

Moore however disagrees, and believes that the hurricane damage necessitated the full replacement of the roof. The roof ultimately was replaced.

43. Mr. Sansone's notes also reflected limited damage to some windows and sliding glass doors, but did not contemplate a full replacement.

44. Except for these two difference however, both Mr. Moore and Mr. Sansone's analysis of the scope of hurricane related repairs appears to be the same.

45. Despite having received the Taylor and WindReady Estimates on January 6th, 2012, QBE did not invoke any of Biscayne Cove's post-loss obligations under the insurance policy until February 6th, 2013, more than a full year later after it received Biscayne Cove's appraisal estimates, and six years after the loss. The letter containing these requests was admitted as Plaintiff's Exhibit 18.

46. QBE acknowledged that its delay in making these post-loss obligations requests was a "strategic decision."

47. During course of the case, QBE took eight different depositions and propounded interrogatories under Rule 33. QBE also obtained document production and inspected nearly all of Biscayne Cove's individual condominium units under Rule 34.

48. There were a number of discovery calendar hearings in this case. QBE has not alleged that Biscayne Cove failed to comply with any of the Court's discovery orders.

49. QBE's representatives inspected the vast majority of Biscayne Cove's building, including the interiors of nearly every individual condominium unit during these inspections.

50. In its February 6th, 2013 letter admitted as Plaintiff's Exhibit 18, QBE requested that Biscayne Cove provide a sworn statement in proof of loss.

51. The proof of loss that Biscayne Cove provided was admitted as Defendant's Exhibit 4. That document incorporates by reference Biscayne Cove's answers to some of QBE's interrogatories served in this case.  QBE acknowledges that Biscayne Cove provided the proof of loss within the time period required under the subject insurance policy.

52. The interrogatory responses incorporated into the proof of loss explain that Biscayne Cove's estimate includes windows and sliding glass doors that were not damaged by the hurricane, but that local building codes would require it to replace as a condition of replacing the windows and sliding glass doors that were damaged by the hurricane.

53. Biscayne Cove's position that it would be required to replace undamaged windows and sliding glass doors is based upon its opinion that more than 30% of its windows and sliding glass doors were damaged, and the applicable building code contains a "30% Rule" that would mandate that all of Biscayne Coves' windows and sliding glass doors must be brought into compliance with the current code mandating the use of hurricane impact glass.  Biscayne Cove further believes that different provisions of the subject insurance policy, including provisions under the "Valuation" and  "Law and Ordinance – Coverage 'A'" provisions entitle Biscayne Cove to recover benefits for the repairs to the undamaged windows and sliding glass doors.

54. In addition to requesting the proof of loss, the February 6th, 2013 letter also contains a request for "complete inventories" of the windows and sliding glass doors that Biscayne Cove claims "…suffered direct physical loss or damage requiring replacement as a result of Hurricane Wilma, and which did not." That letter also requests that Biscayne Cove provide one or more representatives concerning eight different topics designated in that letter.

55. The parties agreed to consolidate the examinations under oath with Rule 30(b)(6) depositions, and Biscayne Cove produced both its president, Madeline Giardello and its treasurer, Oliver Gross, for examination. Both of those individuals also testified at trial.

56. The February 6th, 2013 letter is the only request that QBE has ever made for "inventories", examinations under oath, or a sworn statement in proof of loss.

57. Other than its letter purporting to deny the claim in full, QBE has never sent Biscayne Cove any correspondence expressing dissatisfaction with Biscayne Cove's response to its February 6th, 2013 post-loss obligations requests.

58. Jeffrey Dobbins testified briefly at trial. His company, TSSA had been retained to conduct an analysis of Biscayne Cove's windows and sliding glass doors. However, TSSA has not yet completed its inspections or analysis.

59. Mr. Dobbins testified that it would cost approximately $85,000 for his company to complete its inspections and analysis.

60. During the trial and pursuant to the parties' agreement reached very shortly before trial, Mr. Dobbins provided QBE with photographs and "tick sheets" reflecting the analysis TSSA has completed to date. These photographs and "tick sheets" contain a partial itemization of the damage Biscayne Cove's windows and sliding glass doors that TSSA attributes to Hurricane Wilma.

61. QBE's Rule 34 Request for Entry Upon Land in this case was admitted into evidence as Plaintiff's Exhibit 24. It was served on January 25th, 2013 and specifically requests access to "… all individual condominium units and common areas." This demonstrates that QBE had decided to pursue inspection of all of Biscayne Coves' individual apartment units *before* it made its first and only request for "inventories" on February 6th, 2013.

## II. CONCLUSIONS OF LAW

1.  The issues raised in this declaratory judgment action are limited to whether Biscayne Cove is entitled to an appraisal and whether windows and sliding glass doors are covered under the subject insurance policy. Thus, the Court is not charged with resolving the dispute between the parties concerning the amount of the underlying claim.

2.  The subject insurance policy contains a standard appraisal clause providing that in the event either party makes a written demand, each party shall select an appraiser. The appraisers will then mutually select a neutral umpire, if they are unable to agree, a court may appoint one.

3.  Florida courts construing similar appraisal clauses in property insurance policies have explained that "[a]ppraisers are generally expected to act on their own skill and knowledge; they may reach individual conclusions and are required to meet only for the purpose of ironing out differences in the conclusions reached[.]'" *Allstate Insurance Company v. Suarez*, 785 So.2d 645, 646-647 (Fla. 3d DCA 2001)(aff'd. 833 So.2d 862), citing *Liberty Mut. Fire Ins. Co. v. Hernandez,* 735 So.2d 587 (Fla. 3d DCA 1999).

4.  When the court is called upon to appoint a neutral umpire for a property insurance appraisal, it must select a neutral umpire with appropriate expertise, and may consider a retired judge, qualified attorney, or construction professional. *See Liberty Mutual Fire Ins. Co. v Hernandez*, 735 So.2d 587, 589 (Fla. 3d DCA 1999)

5.  The Florida Supreme Court has explained that "…[w]hen the insurer admits that there *is* a covered loss, but there is a disagreement on the *amount* of loss, it is for the appraisers to arrive at the amount to be paid. In that circumstance, the appraisers are to inspect the property

and sort out how much is to be paid on account of a covered peril." *Johnson v. Nationwide Mut. Fire Ins. Co.,* 828 So.2d, 1021, 1925 (Fla. 2002)(emphasis in the original) *Citing State Farm Fire & Casualty Co. v. Licea,* 685 So.2d 1285, 1287-1288 (Fla.1996). This rule applies even when there is "…a large discrepancy between the insured's and insurance carrier's estimate of the loss" *Kendall Lakes Townhome Developers v. Agricultural Excess and Surplus Lines Ins. Co.,* 916 So.2d 12, 16 (Fla. 3d DCA 2005).

6. Under Florida law as interpreted by the cases above, the determination concerning the amount of Biscayne Cove's Hurricane Wilma claim cannot appropriately be made in this lawsuit. Both parties have a contractual right to have that determination made in the appraisal process and Biscayne Cove has not waived that right.

7. In this case, QBE has inappropriately labeled its disagreement with Biscayne Cove's position concerning the amount of the underlying claim as fraud. Biscayne Cove has clearly put QBE on notice that its loss estimates contain building components that weren't directly damaged. Biscayne Cove has also explained why it believes it is entitled to undamaged property. QBE has therefore failed to identify any arguably false or misleading statement by Biscayne Cove in connection with its claim, and QBE's fraud defense fails.

8. The nature of the post-loss obligations is merely to provide the insurer with an independent means by which to determine the amount of loss, as opposed to relying solely on the representations of the insured. *U.S. Fidelity and Guarantee Co., v. Romay*, 744 So.2d 467,471 n.4 (Fla. 3d DCA 1999).

9. The exchange of information necessary for there to be a sufficient exchange of information in order for a Court to compel appraisal may take place through discovery in

litigation seeking to compel appraisal. *Scottsdale Ins. Co. v. University at 107th Ave. Inc.,* 827 So.2d 1016 (Fla. 2002)

10. Because Biscayne Cove's claim involves only real property made under the subject insurance policy's "building" coverage, the policy provisions relating to "complete inventories of the damaged and undamaged property" is inapplicable.

11. The word "inventory" cannot be reasonably construed as referring to building components. See NEW OXFORD AMERICAN DICTIONARY, p. 914, Third Edition, Oxford University Press, eds. Angus Stevenson and Christine A. Lindberg, defining the word "inventory" as "[a] complete list of such as property, goods in stock, or the *contents* of a building." Emphasis added. Similarly, Black's Law Dictionary defines the term "inventory" as "*[p]ersonal property* leased or furnished, held for sale or lease, or to be furnished under a contract for service; raw materials, work in process, or materials used or consumed in a business, including farm products such as crops or livestock." Emphasis added. Black's Law Dictionary, 8th Edition, Copywrite 2004, West Group, Bryan A. Garner, Editor in Chief, p. 844. This point is further supported by Count on Insurance's discussion of inventory provisions in the insurance policy nothing that they do not apply to fire damage to an insured building. See 13 Couch on Ins. § 189:76 Inventory citing *Weiman v. National Ben Franklin Fire Ins. Co. of Pittsburgh, Pa.*, 159 N.Y.S. 698 (App. Term l9l6).

12. In its definition of "Covered Property" on the first page of the subject insurance policy's Condominium Association Coverage Form CP 00 17 04 02, (D.E. 68-2, p.43) the policy specifically includes separate definitions for the "building" and "Personal property owned by [Biscayne Cove]." Similarly, the subject insurance policy's declaration page refers to separate "building" and "contents" coverages. (D.E. 62-2, 6).

13. The plain language of the insurance policy distinguishes between real property and personal property. Given the definitions of the word "inventory" found in both the New Oxford American Dictionary and Blacks Law Dictionary. the Court concludes that the policy provisions relating to "inventories of the damaged and undamaged property" applies only to claims involving personal property. This conclusion is supported by the related discussion in Couch on Insurance cited above.

14. Even if the inventory provision did apply, the Court concludes that the Taylor and WindReady estimates found in Exhibit 1 contain all the information that an "inventory" must contain. Notably, even in the context of a contents claim where the inventory provision clearly applies, there is nothing in the policy that requires the policyholder to segregate items that sustained "direct physical loss or damage" from items listed on the inventory for other reasons. The Court is not free to add new terms to an insurance policy. *See Buckley Towers  v. QBE Ins. Co.,* 395 F.App'x. 659,666 (11th Cir. 2010), citing. *Royal Ins. Co. v. Latin Am. Aviation Servs., Inc.,* 210 F.3d 1348, 1351 (11th Cir.2000).

15. For the same reason, the Court finds that Biscayne Cove complied with its policy obligation relating to the proof of loss. QBE asks the Court to nullify the timely proof of loss because Biscayne Cove struck boilerplate language asking the insured to swear that only items that were directly damaged by the hurricane were included. However, nothing in the plain language of the policy prevents the policyholder from altering the boilerplate in the proof of loss. Here, the proof of loss form that QBE provided required Biscayne Cove to state the total amount of its claim, while simultaneously swearing that the only damaged items were included. But since Biscayne Cove's claim involves undamaged property, Biscayne Cove could not have

accurately stated the total amount of its claim and simultaneously sworn that only damaged items were included.

16. Similarly, the Court also finds that Biscayne Cove complied with its obligations relating to the examination under oath. QBE's primary complaint concerning the examination under oath was that Biscayne Cove's representatives did not properly prepare for the examination under oath. However, nothing in the plain language of the insurance policy requires the policyholder to prepare for an examination. As *Buckley Towers* notes, a Court may not add new terms to the insurance policy.

17. In order to prevail on a lack of cooperation defense, "… an insurance company must show that it was substantially prejudiced in the particular case by failure to cooperate." *Ramos v. Northwestern Mut. Ins. Co.*, 337 So.2d 71, 75 (Fla. 1976). The insurer must also "…show that it has exercised diligence and good faith in bringing about the cooperation of its insured and must show that it has complied in good faith with the terms of the policy." *Id*. at 75.

18. Even if the "inventories" provision of the subject insurance policy did apply and even if Biscayne Cove had failed to comply, the Court would still have to find that QBE failed to prove that it exercised diligence and good faith in connection with that request. The evidence showed that QBE made that request only one time. That was in its February 6th, 2013 letter. That letter also raised a variety of other issues and was sent the parties were actively completing discovery. During trial, Biscayne Cove presented evidence showing that it would have to pay TSSA approximately $85,000 to comply with the request for unit-by-unit itemization of damaged windows and sliding glass doors. Biscayne Cove suggested less burdensome alternatives, such as a joint inspection of a limited number of units. Diligence and good faith

would have required QBE to up on its initial request and considered less expensive and burdensome alternatives.

19. QBE has also failed to show any prejudice arising from Biscayne Cove's asserted non-compliance with the "inventory" request. While QBE argued that it would not have had to incur the expense of inspecting all the units if Biscayne Cove provided the requested "inventory" the evidence shows that QBE actually requested access to its all the units in its January 2013 Rule 34 request. This proves that QBE had decided to inspect all the units before it the February 2013 letter requesting "inventories." Accordingly, this fact undermines QBE's claim that the decision to inspect all of the units can be attributed to Biscayne Cove's asserted non-compliance with the "inventory" request.

20. Similarly, the Court must also find that even if Biscayne Cove's examinations under oath were deficient, QBE has failed to prove either good faith or diligence as required under *Ramos*. QBE never expressed any dissatisfaction with Biscayne Cove's examination under oath testimony until it sent a letter denying claim. Email correspondence between counsel admitted as Plaintiff's Exhibit Number 4 shows that Plaintiff's counsel contacted defense counsel regarding examinations under oath on April 1st, 2013, after Ms. Giardello's and Mr. Gross's examinations had been completed. Defense counsel did not express any dissatisfaction regarding the these examinations and simply advised that the examinations under oath had been completed.

21. QBE has also failed to prove that it sustained prejudice as a result of any asserted deficiencies concerning the examination under oath. While QBE complains bitterly that Biscayne Cove didn't properly prepare for the examination, QBE did not identify a single question that it claims Biscayne Cove's witnesses were unable to answer. Similarly, QBE has not

even suggested any information that it need for its evaluation of the claim that it did not obtain through the examinations. Notably, QBE's adjuster testified that he never reviewed the transcript. The reason why the policy requires an examination under oath is to assist in the adjustment of the claim. If the individual responsible for adjusting the claim doesn't read the transcript, there is no basis for the insurer to claim prejudice.

22. Importantly, QBE was allowed broad discovery under the Federal Rules of Civil Procedure in this matter. Discovery was already in progress when QBE began making its post-loss requests. This enabled QBE to obtain documents and testimony from third parties. QBE deposed eight witnesses in this matter, including former Biscayne Cove employees who were working at Biscayne Cove at the time of the storm. Under *Scottsdale Ins. Co. v. University at 107th Ave.*, 827 So.2d 1016 (Fla. 3d DCA 2002), the exchange of information sufficient to compel appraisal can be based on discovery done in the lawsuit seeking appraisal. The use of discovery in this case enabled QBE to obtain far more documents and testimony than it could have obtained through requests made under the contractual post-loss obligations. Thus, QBE did not sustain any prejudice from any asserted deficiencies in the examination under oath witnesses testimony.

23. Section 626.9541(i)3.g, Florida Statutes provides that the failure to "promptly notify the insured of any additional information necessary for the processing of a claim" is an unfair insurance trade practice. The evidence shows that QBE made all of its post-loss obligations requests more than six years after the loss. QBE describes this as a "strategic decision." Obviously, the passage of so many years would necessarily affect the witnesses testimony at the examination under oath. QBE's strategic decision does not excuse its statutory obligations. If QBE needed an examination under to adjust the claim, it should have requested

one before it closed the claim in 2007. QBE's "strategic decision", and its adjuster's candid acknowledgement that he never read the transcripts, show that QBE never even intended to use the examinations to adjust the claim.

24. QBE similarly failed to show good faith, diligence, or prejudice in connection with the request for a proof of loss. QBE's corporate representative admitted that QBE never expressed any dissatisfaction concerning the proof of loss that Biscayne Cove provided before denying the claim. This is a lack of diligence. At the very least, QBE should have put Biscayne Cove on notice of its contention that the proof of loss was deficient and allowed Biscayne Cove to consider remedying any asserted deficiency before denying the claim entirely.

25. QBE has not offered any explanation as to how it claims to have been prejudiced by the asserted deficiencies in the proof of loss. Accordingly, there is no basis for the Court to find that QBE was prejudiced.

26. The parties agree that Biscayne Cove's insured property sustained damage as a result of a hurricane while the policy was in force, and that Biscayne Cove has demanded appraisal. QBE's affirmative defense relating to fraud and concealment and non-compliance with post-loss obligations fail as a matter of law and fact. Accordingly, Biscayne Cove is entitled to a declaratory judgment in its favor compelling appraisal and retaining jurisdiction to appoint a neutral umpire and confirm any resulting appraisal award and reduce it to judgment.

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5th , 2013 I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below by notice of electronic filing:

Raoul G. Cantero ESQ.  
White and Case LLP  
Wachovia Financial Center  
200 S. Biscayne Blvd.  
Miami, FL 33131  
rcantero@whitecase.com  
Co-counsel for QBE Ins. Co.

Corey Harris ESQ.  
The Merlin Law Group  
777 Harbour Island Blvd. Ste. 950  
Tampa, FL 33602-5747  
CHarris@merlinlawgroup.com  
Co-counsel for Biscayne Cove Condo. Ass'n.

Maria J. Beguiristain ESQ.  
White and Case LLP  
Wachovia Financial Center  
200 S. Biscayne Blvd.  
Miami, FL 33131  
mbeguiristain@whitecase.com  
Co-counsel for QBE Ins. Co.

Douglas Grose ESQ.  
The Merlin Law Group  
777 Harbour Island Blvd. Ste. 950  
Tampa, FL 33602-5747  
DGrose@merlinlawgroup.com  
Co-counsel for Co-counsel for Biscayne Cove Condo. Ass'n

William S. Berk ESQ  
Berk Merchant and Sims PLC  
2 Alhambra Plaza, Suite 700  
Coral Gables, FL 33134  
wberk@berklawfirm.com  
Co-counsel for QBE Ins. Co.

Jean Niven ESQ.  
The Merlin Law Group  
777 Harbour Island Blvd. Ste. 950  
Tampa, FL 33602-5747  
JNiven@merlinawgroup.com  
Co-counsel for  Biscayne Cove Condo. Ass'n.

William Xanttopoulos, ESQ  
Berk Merchant and Sims PLC  
2 Alhambra Plaza, Suite 700  
Coral Gables, FL 33134  
wberk@berklawfirm.com  
Co-counsel for QBE Ins. Co.

Amy DeMartino, Esquire
ademartino@wickersmith.com
WICKER, SMITH, ET. AL.
P.O. Box 2508
West Palm Beach, Florida 33401
Co-counsel for QBE Ins. Co.

William F. Fink, Esquire
wfink@wickersmith.com
WICKER, SMITH, ET. AL.
P.O. Box 2508
West Palm Beach, Florida 33401
Co-counsel for QBE Ins. Co.

Damien D. Daley, Esquire
ddaley@wickersmith.com
WICKER, SMITH, ET. AL.
P.O. Box 2508
West Palm Beach, Florida 33401
Co-counsel for QBE Ins. Co.

**/S/ Jeffrey N. Golant**