UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NUMBER 10-23728-CIV-O'SULLIVAN

[CONSENT]

BISCAYNE COVE CONDOMINIUM
ASSOCIATION,

     Plaintiff,

v.

QBE INSURANCE CORPORATION

     Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     THIS MATTER comes before the Court following a three-day bench trial

commencing on July 15, 2013. The parties consented to trial before a United States

Magistrate Judge. See Election to Jurisdiction by a United States Magistrate Judge for

Trial (DE# 16-1, 1/18/11). This matter was referred to the undersigned by the

Honorable Patricia A. Seitz, United States District Judge, in accordance with 28 U.S.C.

§ 636(b). See Order of Reference (DE# 17, 1/20/11). The Court has reviewed the

testimony, the exhibits presented at trial and the parties' post-trial filings and makes

these findings of fact and conclusions of law as required by Rule 52(a) of the Federal

Rules of Civil Procedure.[1]

---

[1] Any proposed finding of fact or conclusion of law that is not included in this document
has either been rejected by the Court or is unnecessary to the disposition of this matter.

# FINDINGS OF FACT[2]

## Background

1.     Biscayne Cove Condominium Association, Inc. (hereinafter "plaintiff") is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

2.     QBE Insurance Corporation (hereinafter "defendant") is a Pennsylvania corporation with its principal place of business in New York.

3.     The plaintiff is the condominium association for a residential property located at 18151 and 18181 N.E. 31 Court, Aventura, Florida 33160 (hereinafter "property").

4.     The property includes two residential buildings: the Tower Building and the Clipper Building.

5.     The property was insured under QBE insurance policy QF2862-07 (hereinafter "policy").

6.     Direct physical damage from a hurricane is a covered peril under the policy, subject to the policy's terms, conditions, limitations and exclusions.

7.     The policy's hurricane deductible was $720,729 for the Tower Building and $695,039 for the Clipper Building.

8.     On October 24, 2005, Hurricane Wilma struck South Florida.

9.     Hurricane Wilma caused damage to the property.

10.     On October 26, 2005, the plaintiff provided timely notice to the defendant that it had sustained a loss caused by Hurricane Wilma through an "Acord Property Loss Notice" form (hereinafter "Acord form"). See Plaintiff's Exhibit 13. The Acord form

---

[2] To the extent that any of these findings of fact constitute conclusions of law, they are adopted as such.

advised the defendant that the property had sustained "severe damage," including

"windows out" and "sliders broken." Id.

11.     At all material times, Florida Intracoastal Underwriters ("FIU") acted as the

general managing agent for the defendant in Florida.

12.     FIU retained Interloss, Inc. (hereinafter "Interloss"), an independent adjusting

firm, to investigate and adjust the plaintiff's claim.

13.     Robert Sansone is a licensed independent adjuster[3] and the owner of Interloss.

14.     At the time, the plaintiff was represented by public adjuster[4] Dick Tutwiler.

15.     In instances where the insured is represented by a public adjuster, the protocol is

for the independent adjuster to communicate directly with the public adjuster instead of

the insured.

**The 2005 Inspection**

16.     On November 2, 2005, Mr. Sansone received the assignment from FIU to

investigate and adjust the plaintiff's Hurricane Wilma claim.

17.     Sometime between November 2, 2005 and November 9, 2005, Mr. Sansone

spoke with Mr. Tutwiler and arranged for an inspection of the property.

18.     On November 9, 2005, Mr. Sansone went to the property to conduct the

inspection. He met with Mr. Tutwiler, Lee Patrone (the property manager) and Jaime

Balaguer (the building maintenance engineer).

19.     As the property manager, Mr. Patrone was the plaintiff's agent and the plaintiff

---

[3] An "independent adjuster" is an individual licensed only to represent the insurance
company.

[4] A "public adjuster" is an individual licensed only to represent the insured.

3

believed it was bound by Mr. Patrone.

20.     Mr. Tutwiler asked Mr. Patrone and Mr. Balaguer to show Mr. Sansone the damage to the property. Mr. Balaguer escorted Mr. Sansone through the property.

21.     Mr. Balaguer showed Mr. Sansone the damage to the roofs of the Tower Building and the Clipper Building. Mr. Sansone observed two 90-ton air conditioner condenser units that were toppled over, some sheet metal damage, some damaged exhaust fans, damage to a door to the mechanical room and a damaged roof-top security camera.

22.     Mr. Patrone told Mr. Sansone that he had obtained proposals to replace the roof-top air conditioner condenser units for each building. According to Mr. Patrone, the replacement cost of the condenser unit for the Clipper Building was approximately $220,000 and the replacement cost of the condenser unit for the Tower Building was approximately $246,000. Mr. Sansone requested a written copy of the proposals from Mr. Patrone. Mr. Sansone never received a copy of the condenser unit proposals.

23.     Mr. Balaguer also took Mr. Sansone to penthouses 8 and 9 of the Tower Building. Mr. Sansone observed that most of the windows and sliding glass doors in those two units were boarded up. He was told that those windows and sliding glass doors had been "blown out" by Hurricane Wilma. Mr. Sansone also observed some drywall damage in the penthouse units.

24.     While at the property, Mr. Sansone observed "swing stage equipment" along the "07" line of units in the Tower Building. Swing stage equipment is used by contractors to gain access to the exterior walls or balconies of a building. Mr. Sansone was told during the inspection that the equipment was on the Tower Building before Hurricane Wilma.

**Interloss' Initial Estimate**

25.     Following his inspection, Mr. Sansone prepared a preliminary estimate of the damage he observed at the property. He estimated that the damage to the Tower Building totaled $531,000. Mr. Sansone added an additional $300,000 contingency for unknown factors such as increased labor costs that usually occur after a hurricane. Thus, the total estimate amount prepared by Mr. Sansone for the Tower Building was $831,000.

26.     For the Clipper Building, Mr. Sansone estimated damages in the amount of $633,000. Mr. Sansone added a $300,000 contingency amount, for a total of $933,000.

27.     Mr. Sansone's estimate included a $250,000 estimate for windows and sliding glass doors. See Plaintiff's Exhibit 14.

28.     Mr. Sansone prepared a report to FIU based on his observations at the inspection. Mr. Sansone estimated that the total damage was $1.7 million minus $1,415,768.00 deductibles ($720,729 for the Tower Building and $695,039 for the Clipper Building) and rounded this amount to $300,000. The $1.7 million amount included $600,000 for contingencies ($300,000 for each building). The $600,000 contingency amount did not represent actual damage to the property.

**Jack Brown Roofing Inspection**

29.     During his inspection in November 2005, Mr. Sansone observed some "up-lift"[5] damage to the roof of the Clipper Building and assigned Jack Brown Roofing Consultants to inspect both roofs.

—————————————

[5] The term "up-lift" refers to wind pressure causing the roof material to momentarily lift up before settling back down, resulting in the creasing and cracking of roofing material.

5

30.     In January 2006, Jack Brown Roofing inspected the roofs of the Tower Building and the Clipper Building.

31.     Jack Brown Roofing determined that 13 percent of the Clipper Building roof was damaged by Hurricane Wilma and required repair.

32.     Jack Brown Roofing also determined that 17 percent of the Tower Building roof was damaged by Hurricane Wilma and required repair.

**Other Activity at the Property**

33.     After Hurricane Wilma, Madeline Giardiello, the plaintiff's president, met with Joe Knapp, the plaintiff's insurance agent. Mr. Knapp told Ms. Giardiello that windows and sliding glass doors were not covered under the policy.

34.     The defendant never communicated to the plaintiff that the policy did not cover windows and sliding glass doors.

35.     The defendant never told the plaintiff that it was denying coverage for windows and sliding glass doors.

36.     By December 15, 2005, the plaintiff had determined that it needed a special assessment for all known Hurricane Wilma damage totaling $1,483,906.68. The assessment included numerous items totaling $479,000 not covered under the policy.

37.     The plaintiff imposed the special assessment, in part, because its public adjuster believed that the Hurricane Wilma damages were below the deductible.

38.     On February 1, 2006, the plaintiff submitted a supplemental application for insurance renewal to FIU. See Defendant's Exhibit 2. In the section for hurricane loss history, the plaintiff identified the Tower Building roof as having partial damage and the Clipper Building roof as requiring a full replacement. It described its glass damage as

6

"four large window sections blown out" and "six sliding doors were damaged." Id. The plaintiff further stated that the glass was to be replaced within code.

39.     At the time it filled out the Supplemental Application on February 1, 2006, the plaintiff believed that the roof of the Tower Building was partially damaged, but did not require full replacement. Initially, the plaintiff believed that 20 percent of the Tower Building roof was damaged.

40.     At some point, the plaintiff retained a consultant to evaluate the roof of the Tower Building. After being advised that the damage to the Tower Building roof was approximately 30 percent, the plaintiff decided to replace the entire roof.

41.     The plaintiff did not notify the defendant of the additional damage to the roof or of the plaintiff's decision to replace the roof of the Tower Building.

42.     The plaintiff eventually replaced the roofs of both the Tower Building and the Clipper Building.

43.     On March 29, 2006, the plaintiff received a letter from its attorney, Becker & Poliakoff, stating that "the Condominium Act makes it clear that things like windows and doors are covered by the master policy. However, the issue arises when there is no money from the master policy paid for windows and doors as a result of deductibles." See Defendant's Exhibit 27. The "master policy" in the instant case is the insurance policy issued by the defendant.

44.     On June 8, 2011, after this lawsuit was filed, the plaintiff submitted an application for insurance to Citizens Property Insurance Corporation. See Defendant's Exhibit 40. In the supplemental application for wind insurance, the plaintiff responded "no" to the question of whether it had any existing damage. Id.

**Additional Communications between Mr. Sansone, Mr. Tutwiler and Mr. Patrone**

45.     On the same day that the plaintiff received the letter from Becker & Poliakoff, March 29, 2006, Mr. Patrone called Mr. Sansone and told him that he had discovered that the windows in the "07" line of units in the Tower Building had "moved" during Hurricane Wilma and that concrete repair and window removal was necessary.

46.     Mr. Patrone also told Mr. Sansone that the windows of four or six units in the Tower Building needed to be replaced and that a couple of windows and sliding glass doors in a couple of units in the Clipper Building needed to be replaced.

47.     Mr. Patrone informed Mr. Sansone that according to 150 survey responses from the unit owners, all or most of the surveys showed that those units had suffered water intrusion.

48.     Mr. Patrone also reported that he had a proposal of approximately $60,000 to re-caulk certain windows in the Clipper Building because of water intrusion.

49.     Mr. Sansone told Mr. Patrone that he would need to inspect the damage to the "07" line of units. He also requested the documentation for the damaged windows and sliding glass doors in both buildings and told Mr. Patrone that he would need to inspect the condition of the damaged windows and sliding glass doors. Mr. Sansone asked for copies of the unit owner surveys and to inspect each of those units. Mr. Sansone also asked for a copy of the re-caulking proposal.

50.     After Mr. Sansone ended his conversation with Mr. Patrone, he called Mr. Tutwiler and relayed the conversation to Mr. Tutwiler. Mr. Sansone told Mr. Tutwiler that he needed the proposals and that he needed to do a reinspection of the property. Mr. Tutwiler told Mr. Sansone that he would contact the insured and make arrangements.

8

51.     Mr. Sansone sought to reinspect the property to determine if he needed to retain any additional experts in evaluating the plaintiff's claim. Mr. Sansone sought to inspect the units reporting rain and water intrusion so that he could determine causation.

52.     Mr. Sansone sought copies of the various written proposals so that he could determine whether they were accurate, whether they were related to Hurricane Wilma and whether they were covered under the policy.

53.     From November 2005 through January 2007, Mr. Sansone spoke with Mr. Tutwiler multiple times. During these conversations, Mr. Sansone renewed his request to reinspect the property and reminded Mr. Tutwiler of his outstanding request for documents.

54.     Mr. Tutwiler told Mr. Sansone that he was trying to get the requested information from the insured, but that the insured was not cooperating with him. Mr. Tutwiler represented to Mr. Sansone that the plaintiff was not returning his telephone calls.

55.     Prior to the filing of this lawsuit, Mr. Sansone did not receive permission to reinspect the property.

56.     Prior to the filing of this lawsuit, Mr. Sansone did not receive the requested written proposals for the replacement of the condenser units, copies of the unit owner surveys, or the re-caulking proposal. The defendant received some documents during discovery after this lawsuit was filed.

57.     Had Mr. Sansone been allowed to reinspect the property in 2006, he would have examined the cause of the water intrusion into the units. Had Mr. Sansone been provided with copies of the unit owner surveys in 2006, he would have inspected those units and consulted with the unit owners in regard to the conditions of the windows and

sliding glass doors.

58.    Mr. Sansone did not make any of his requests to Mr. Tutwiler for reinspection or for documents in writing because he was adjusting a large number of claims at the time and was very busy.

59.    FIU's log notes do not reflect Mr. Sansone's requests for documents and request for reinspection.

**Mr. Sansone's Closing of the File**

60.    Sometime in February 2007, Mr. Tutwiler represented to Mr. Sansone that he had come to the conclusion that the claim was under the deductibles, the insured was not cooperating and that he was going to close his file.

61.    In early 2007, Mr. Sansone revised his estimates. The revised estimates included the estimates from Jack Brown Roofing which were not available at the time Mr. Sansone prepared his preliminary estimate.

62.    In the revised estimate, Mr. Sansone determined that the damage to the Tower Building was $510,971 and the damage to the Clipper Building was $326,000. Mr. Sansone did not include any contingency costs in the revised estimate. The damage to both buildings was below the deductible.

63.    Because the initial $600,000 contingency did not constitute any actual damage to the property, at no time did Mr. Sansone's estimates of the damage to the property exceed the deductible.

64.    Mr. Sansone notified FIU of his assessment that the damages were below the deductible and closed the file on March 2, 2007.

10

**The Solicitation of the Plaintiff By Richard Moore**

65.     Richard Moore is the president and owner of Paramount Consulting, a public adjusting and loss consulting firm.

66.     Mr. Moore was interested in reopening Hurricane Wilma claims involving the defendant because the defendant had denied coverage for windows and sliding glass doors in the past. Mr. Moore also believed there were a large number of insurance claims that were closed by the defendant without payment.

67.     Mr. Moore viewed this as both a business opportunity and an opportunity to assist policyholders.

68.     The plaintiff's current counsel provided a list of potential witnesses to Mr. Moore in another matter involving the defendant. The plaintiff was one of the entities on that list.

69.     In late August or early September of 2010, Mr. Moore met with the plaintiff. Mr. Moore told the plaintiff that he believed there was damage to the plaintiff's windows and sliding glass doors and that he wanted to do an inspection.

70.     At the time, the plaintiff was not looking to re-open its Hurricane Wilma claim nor was it looking for a public adjuster to assist it in pursuing its claim.

71.     On September 29, 2010, the plaintiff signed a contract with Mr. Moore's company. See Defendant's Exhibit 38. The contract provided that Mr. Moore's company would receive a 20 percent contingency fee. Id.

72.     Mr. Moore acted as the plaintiff's appraiser and public adjuster.

**Mr. Moore's Inspection and Estimate**

73.     At some point, Mr. Moore conducted a preliminary inspection of the property and

11

saw a sample of the damaged windows and sliding glass doors. Mr. Moore could not remember if this inspection occurred before or after this lawsuit was filed.

74.    The sample size inspected by Mr. Moore was more than 10 percent, but less than 20 percent of the units in both buildings.

75.    Mr. Moore took no field notes, log notes or photographs during his inspection of the property because he was the only person working on the file and he expected to work as an appraiser in the appraisal process.

76.    Mr. Moore could not identify which windows and sliding glass doors he inspected or which units he went into.

77.    Based on his conversations with Ms. Giardiello and the maintenance staff and his inspection of less than 20 percent of the units, Mr. Moore believed that the damage to the windows and sliding glass doors was over 30 percent and that, as a result, all the windows and sliding glass doors had to be replaced.

78.    Mr. Moore determined that all windows and sliding glass doors needed replacement based on his interpretation of the Florida Building Code. Mr. Moore believed that the Florida Building Code required that if 30 percent or more of the glazing was going to be replaced in a 12-month period, all windows and sliding glass doors needed to comply with the current code in that section, which required hurricane impact resistant safety glazing. Mr. Moore referred to this as the "30 percent rule"

79.    Mr. Moore did three preliminary estimates of the property. The estimate for the Tower Building was $12.3 million, the estimate for the Clipper Building was approximately $4.49 million and the estimate for the common areas was approximately $27,000. Mr. Moore's estimates provide for hurricane-resistant impact glass for all

windows and sliding glass doors. Mr. Moore prepared these estimates with the intent of presenting them to an opposing appraiser in the appraisal process.

80.     The current windows and sliding glass doors on the property are not hurricane impact resistant safety glazing.

**The Instant Action**

81.     On October 18, 2010, the plaintiff filed the instant action seeking a declaratory judgment that windows and sliding glass doors were covered under the policy and to compel appraisal.

82.     The plaintiff, through counsel, sent the defendant a letter dated October 19, 2010 invoking the contractual appraisal process and demanding appraisal.

83.     The defendant did not consent to an appraisal.

84.     On March 16, 2011, the Court stayed this action pending a decision by the Florida Supreme Court in QBE Ins. Corp. v. Chalfonte Condo. Apt. Assn'n, Inc., 94 So. 3d 541 (Fla. 2012).

85.     In July 2011, Taylor Contracting and Roofing and WindReady created estimates. WindReady prepared an estimate for the replacement of every window and sliding glass door with hurricane impact glass. Taylor Contracting and Roofing incorporated WindReady's estimate and created its own estimate using invoices of repairs that had been done to the Tower Building roof. The total amount of this estimate was $16,847,125.29. The plaintiff did not provide these estimates to the defendant until January 2012.

86.     On August 10, 2012, the Court lifted the stay in this case.

87.     TSSA, a structural glazing inspection company, was retained by the plaintiff to

conduct an analysis of the property's windows and sliding glass doors. In April 2012, TSSA inspected both buildings. To date, TSSA has not yet completed its inspections or analysis. To date, TSSA has inspected 35 percent of the Tower Building and 65 percent of the Clipper Building. It would cost $85,000 for TSSA to complete its inspections and analysis.

**The 2013 Inspections**

88.   Through an interrogatory, the defendant first requested a list of units and the damage to those units on December 31, 2012.

89.   On January 25, 2013, the defendant served its Federal Rule of Civil Procedure 34 request for entry upon land seeking access to all individual condominium units and common areas. See Plaintiff's Exhibit 24.

90.   Because the WindReady estimate was for every window and sliding-glass door, the defendant asked to inspect every window and sliding-glass door on the property.

91.   The inspection took place between February 25 and March 6, 2013.

92.   The defendant's experts were able to inspect approximately 95 percent of the units.

93.   Adam Locke, one of the engineers who inspected the property's windows and sliding glass doors on behalf of the defendant, testified that if he had been told a unit's windows had been replaced, he would not have inspected those windows.

94.   If the defendant had been given inventories of damaged and undamaged windows and sliding-glass doors, it would not have inspected every unit. Instead, it would have inspected only those damaged windows and sliding glass doors.

14

**The February 6, 2013 Letter**

95.    On February 6, 2013, the defendant sent the plaintiff a letter requesting

additional information pursuant to the "Duties In The Event Of Loss Or Damage"

provision of the policy. See Plaintiff's Exhibit 18.

96.    The defendant attached to its letter a Sworn Statement in Proof of Loss

(hereinafter "POL") for the plaintiff to complete and return to the defendant within 60

days. See Plaintiff's Exhibit 18 at 3. The letter further requested "complete inventories

of the damaged and undamaged property" including "quantities, costs, values and

amount of loss claimed," "identify[ing] . . . by unit number which windows and sliding

glass doors suffered direct physical loss or damage requiring replacement as a result of

Hurricane Wilma, and which did not." Id.

97.    The February 6, 2013 letter also provided notice to the plaintiff of the defendant's

intent to inspect the property and conduct an examination under oath (hereinafter

"EUO").

98.    The letter identified the following eight areas that the defendant would be

inquiring into during the EUO: (1) the condition of the property (roofs and windows and

sliding glass doors) before October 24, 2005; (2) the plaintiff's Hurricane Wilma claim

made in 2005, including all interaction between Biscayne Cove, its representatives,

including its public adjuster, Mr. Tutwiler and the defendant, FIU and Bob

Sansone/Interloss; (3) the maintenance of the property before and after Hurricane

Wilma; (4) the documents and records which purportedly support the amount of the

estimates previously provided; (5) when and how the plaintiff learned it had over

$16,000,000 in hurricane damage; (6) the quantum of the loss; (7) all repairs and/or

15

replacements of any of the damaged property and (8) any and all steps taken to mitigate the damages. See Plaintiff's Exhibit 18 at 3.

**The POL**

99.    On April 3, 2013, the plaintiff provided to the defendant its response to the POL. See Defendant's Exhibit 4. The plaintiff provided the POL within the time period required under the subject insurance policy.

100.    The plaintiff crossed out the following language from the POL: "no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss, has in any manner been made" and included a reference to its response to Interrogatory No. 2 as an explanation for why that language had been crossed out from the POL. See Defendant's Exhibit 4. Additionally, in response to paragraphs 7 ("[t]he whole loss and damage was") and 9 ("[t]he amount claimed under the above numbered policy is") of the POL, the plaintiff directed the defendant to its interrogatory responses which it attached to the form. Id. The estimate provided in the plaintiff's response to interrogatory 2 included items that were not directly damaged by Hurricane Wilma.

**Request for Inventories of Damaged and Undamaged Property**

101.    The plaintiff never provided the defendant with the requested inventories of the damaged and undamaged property. As a result, the defendant does not know how many or which of the plaintiff's windows and sliding glass doors were damaged as a result of Hurricane Wilma.

102.    At trial, Ms. Giardiello testified that there was a list created after 2010 of all the units that had damaged windows. The plaintiff tasked its security guard supervisor with

16

taking notice of or asking unit owners "if there were any damages to the unit, whether it [was] water intrusion or sliding doors, and he came back with a list that [the plaintiff] had in the manager's office." Trial Transcript (DE# 156 at 57-58).

103.   There is no evidence that this list was provided to the defendant.

104.   This list would have been helpful in responding to the defendant's interrogatory asking for a list of damaged windows.

105.   The plaintiff did not provide to the defendant TSSA's inspection data until July 17, 2013, the third day of trial. On that date, the plaintiff provided to the defendant TSSA's photographs of the property and "tick sheets" reflecting the analysis TSSA had completed to date.

106.   The plaintiff should have provided TSSA's inspection data to the defendant prior to the February 2013 inspections.

107.   The plaintiff was uncooperative in its obligation to provide inventories of damaged and undamaged property to the defendant.

### The EUOs

108.   In response to the February 6, 2013 letter's request for examinations under oath, the plaintiff produced its president, Ms. Giardello, and its treasurer, Oliver Gross, for examination.

109.   Ms. Giardello was deposed on March 18, 2013. Ms. Giardello was deposed as an EUO witness and a Fed. R. Civ. P. 30(b)(6) witness.

110.   Ms. Giardello was designated as the person with knowledge of the plaintiff's dealings with Mr. Tutwiler and its communications with the defendant from Hurricane Wilma to October 2010.

17

111.   Ms.Giardello did not do anything to prepare for her examination under oath and did not know, for example, why Mr. Tutwiler was terminated or how much he was being paid. She did not know if the defendant had even inspected the property in 2005 or 2006.

112.   Mr. Gross was deposed on March 21, 2013. Mr. Gross was deposed as an EUO witness and a Fed. R. Civ. P. 30(b)(6) witness.

113.   Mr. Gross was designated as the person with knowledge of: (1) the condition of the property pre-and post-Hurricane Wilma; (2) assessments for paying for repair or replacement of Hurricane Wilma damage; (3) repair or replacement of Hurricane Wilma damage and records reflecting related expenditures; (4) when and how Biscayne Cove became aware of the damage that is the subject of the claim; (5) appraisals assessments or surveys since 2003; (6) association records and (7) Paramount Consulting.

114.   Mr. Gross did not do anything to prepare for his examination under oath or review any association documents, including documents which were readily available, like work-order logs, board minutes, unit-owner surveys and an October 2005 engineering report.

115.   Mr. Gross had no knowledge of any problems Biscayne Cove was having with the roofs of either building prior to Hurricane Wilma.  Mr. Gross had no knowledge of any roof damage on either building from Hurricane Katrina. Mr. Gross had no knowledge or recollection of any issues the plaintiff was having with the Clipper Building roof in 2004 and 2005. He did not know when the Tower Building roof was replaced. He did not know whether or not the sole reason the Tower roof was replaced was due to

18

Hurricane Wilma damage. Mr. Gross did not know if he had anything in writing from the engineers and consultants who inspected on behalf of the plaintiff. He did not know if the engineers and consultants provided any written reasons why the roofs needed to be replaced. Mr. Gross did not know when the plaintiff's first meetings with Mr. Moore and his company took place.

116.    The plaintiff objects to the Court reviewing the deposition transcripts of Ms. Giardiello and Mr. Gross for the purpose of finding evidence that Ms. Giardiello and Mr. Gross were unprepared for their EUOs. The plaintiff's objection is overruled. Both deposition transcripts were admitted into evidence as Defendant's Exhibits 82 and 83, respectively.

117.    The Court has reviewed both deposition transcripts and finds that both witnesses knew very little about the plaintiff's claims.

**Final Estimate and  Denial of the Plaintiff's Claim**

118.    As a result of the 2013 inspections, Mr. Sansone prepared a revised estimate of the damage to the property in March 2013. See Defendant's Exhibits 79 and 80. Mr. Sansone estimated the potential damage from Hurricane Wilma to the Tower Building to be $543,667.96, with the caveat that some of the damage included may not have been related to Hurricane Wilma. Mr. Sansone's revised estimate of the damage to the Clipper Building was $367,207.95, with the same caveat.

119.    On April 25, 2013, FIU sent a letter to the plaintiff's counsel stating that the defendant was "rejecting the submitted sworn statement in proof of loss and denying coverage pursuant to the terms and conditions of the policy . . . ." Defendant's Exhibit 6. The letter further stated that the plaintiff materially breached the policy by failing to

comply with post-loss conditions, submitted an inflated amount and concealed material facts from the defendant. Id. at 6.

**Prejudice to the Defendant**

120.    The plaintiff's failure to provide documents, including the unit owner surveys and the proposals and estimates, and its failure to allow reinspection in 2006 impaired Mr. Sansone's ability to evaluate and investigate the claim.

121.    The plaintiff undertook repairs to the property including the replacement of the Tower building roof[6] and individual windows and sliding glass doors without prior notification to the defendant. As a result, the defendant will not be able to determine causation with respect to these replaced items.

122.    The 2013 inspections, EUOs and document production did not alleviate the prejudice to the defendant because the property has changed during the ensuing seven to eight years. The property has sustained more wear and corrosion, including tropical storms, damages have been repaired and the property has undergone concrete restoration that could have damaged some windows and sliding glass doors.

## CONCLUSIONS OF LAW[7]

**Jurisdiction and Applicable Law**

1.    The Court has jurisdiction pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy

---

[6] The Court assumes that the Clipper Building roof is not part of the amount the plaintiff seeks to recover in the appraisal process. In response to interrogatory 2, the plaintiff stated that its $16,847,125.29 claim did not include the Clipper Building roof.

[7] To the extent that any conclusions of law constitute findings of fact, they are adopted as such.

exceeds $75,000.

2.      Florida substantive law governs this dispute.

**Appraisal,  Post-Loss Obligations and Conditions Precedent**

3.      The only remaining cause of action[8] is the plaintiff's claim for a declaratory

judgment that it is entitled to have its dispute regarding the amount of the plaintiff's loss

resolved through the appraisal process described in the policy.

4.      The appraisal clause in the policy states in pertinent part that: "If we and you

disagree on the value of the property or the amount of loss, either may make written

demand for an appraisal of the loss. . . ."

5.      "[T]he insured must meet all post-loss obligations before appraisal may be

compelled." United States Fid. & Guar. Co. v. Romay, 744 So. 2d 467, 468 (Fla. 3d

DCA 1999) (en banc).

6.      "[P]ermitting the insured to compel appraisal without first complying with the

policy's post-loss obligations would place the insurer at a considerable disadvantage

entering the appraisal process." Romay, 744 So. 2d 467, 471 n.4.

7.      "The nature of the post-loss obligations is merely to provide the insurer with an

independent means by which to determine the amount of loss, as opposed to relying

solely on the representations of the insured." Id.

_____

[8] On August 10, 2012, the plaintiff filed a Second Amended Complaint (DE# 38, 8/10/12) alleging two causes of action. In Count I, the plaintiff sought a declaratory judgment that the damages to the windows and sliding glass doors of condominium units were covered under the QBE insurance policy. In Count II, the plaintiff sought a declaratory judgment that it was entitled to have its dispute regarding the amount of its loss resolved through the appraisal process described in the policy. On June 12, 2013, the Court dismissed as moot Count I of the Second Amended Complaint (DE# 38, 8/10/12).

8.      In some policies, post-loss obligations are conditions precedent to maintaining an action against an insurer or recovering under the policy. See, e.g., Goldman v. State Farm Gen. Ins. Co., 660 So. 2d 300, 304 (Fla. 4th DCA 1995) (concluding that policy provisions requiring examinations under oath were conditions precedent to suit rather than cooperation clauses).

9.      "A condition precedent represents an obligation to be performed before the contract is effective." Allstate Floridian Ins. Co. v. Farmer, 104 So. 3d 1242, 1246 (Fla. 5th DCA 2012) (citation omitted).

10.     "[A] material breach of an insured's duty to comply with a policy's condition precedent relieves the insurer of its obligations under the contract." Starling v. Allstate Floridian Ins. Co., 956 So. 2d 511, 512 (Fla. 5th DCA 2007).

11.     "Courts require there to be at least substantial compliance with conditions precedent in order to authorize performance of the contract." Farmer, 104 So. 3d at 1246 (citation omitted).

12.     In the instant case, the policy issued by the defendant contains the following provision:

> **3.     Duties In The Event Of Loss Or Damage**
>
> **a.** You must see that the following are done in the event of loss or damage to Covered Property:
>
> > **(1)** Notify the police if a law may have been broken.
> >
> > **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.
> >
> > **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

See Plaintiff's Exhibit 16.

13.     The policy also states that: "No one may bring a legal action against us under this Coverage Part unless: . . . There has been full compliance with all of the terms of this Coverage Part."

14.     Under the instant policy, the plaintiff's compliance with "Duties In The Event Of Loss Or Damage" was a condition precedent to filing suit in the instant case. See

23

<u>Farmer</u>, 104 So. 3d at 1246 ("Florida courts have consistently interpreted proof of loss obligations coupled with . . . no-action clauses to be conditions precedent.")

15.     An insured must comply with its post-loss obligations under the policy even where the insurer has propounded discovery pursuant to the Federal Rules of Civil Procedure. The plaintiff's reliance on <u>Scottsdale Insurance Co. v. University at 107th Avenue</u>, 827 So. 2d 1016 (Fla. 3d DCA 2002) is misplaced. An insured cannot avoid its post-loss obligations altogether merely because the parties are engaged in discovery. <u>See</u> <u>Cypress Chase Condo. Ass'n "A" v. QBE Ins. Corp.</u>, No. 10-61987-CIV, 2013 WL 1191413, at *6 n.1 (S.D. Fla. Mar. 22, 2013) (rejecting plaintiff's reliance on "<u>Scottsdale Insurance Co. v. University at 107th Avenue</u>, 827 So. 2d 1016, 1016-17 (Fla. 3d DCA 2002)[ ] for the proposition that the collection of information during discovery is sufficient to satisfy an insured's post-loss obligations . . . . In <u>Scottsdale</u>, the insured waited until after it filed suit to submit a POL statement and make its representative available for an EUO. <u>Id.</u> The court merely found that it was permissible for the insured to wait until after filing suit to comply with its post-loss obligations – not that it could avoid those obligations altogether.").

**<u>Whether Florida Law Requires a Showing of Prejudice</u>**

16.     It is unclear whether Florida law requires a showing of prejudice before the Court can determine that the insured has breached the policy.

17.     Some courts have held that where the insured fails to comply with a condition precedent, the insurer does not need to show any prejudice. <u>See</u> <u>De Ferrari v. GEICO</u>, 613 So. 2d 101, 103 (Fla. 3d DCA 1993) (stating that "prejudice is not at issue when an insurer's reasonable request for an I.M.E. [a condition precedent to coverage] is

refused by an insured."); <u>Goldman v. State Farm Fire Gen. Ins. Co.</u>, 660 So. 2d 300,

306 (Fla. 4th DCA 1995) (holding that "the policy provision at issue [an EUO

requirement] is a condition precedent to suit and that [the insureds]' noncompliance

precludes an action on the policy regardless of a showing of prejudice by the insurer.");

<u>Starling v. Allstate Floridian Ins. Co.</u>, 956 So. 2d 511, 513 (Fla. 5th DCA 2007) (stating

that "[i]t is not necessary for the insurance company to prove prejudice where the

insured fails to comply with a policy condition precedent to suit.").

18.     Other courts have stated that a presumption of prejudice to the insurer arises

where the insured fails to comply with a post-loss obligation and that the insured has

the burden of rebutting this presumption of prejudice. <u>See</u> <u>Allstate Floridian Ins. Co. v.</u>

<u>Farmer</u>, 104 So. 3d 1242, 1246 (Fla. 5th DCA 2012) (stating that "[p]roperly applying

the <u>Macias</u> prejudice presumption rule,[9] the trial court did not err in allowing the

[insureds] to prove to the jury that [the insurer] was not prejudiced by [the insureds']

failure to substantially comply with the proof of loss condition) (footnote added); <u>Kramer</u>

<u>v. State Farm Fla. Ins. Co.</u>, 95 So. 2d 303, 307 (Fla. 4th DCA 2012) (affirming summary

judgment for the insurer where the insureds failed to rebut presumption of prejudice to

the insurer arising from insured's failure to comply with conditions precedent to suit);

<u>Soronson v. State Farm Fla. Ins. Co.</u>, 96 So. 3d 949, 953 (Fla. 4th DCA 2012)

(affirming summary judgment for the insurer where "the insureds failed to come forward

_____

[9] In <u>Bankers Ins. Co. v. Macias</u>, 475 So. 2d 1216 (Fla. 1985), the Florida Supreme
Court stated that "[t]he burden should be on the insured to show lack of prejudice where
the insurer has been deprived of the opportunity to investigate the facts and to examine
the insured." <u>Macias</u> involved an insured's failure to give timely notice of an accident to
an insurer.

with counterevidence sufficient to reveal a genuine issue of material fact as to whether the insurer was prejudiced by the insureds' untimely pre-suit notice of the alleged loss and untimely pre-suit submission of the sworn proof of loss.").

19.     Finally, at least one court has suggested that the insurer has the burden of showing prejudice before it will be relieved of its obligations under the policy where the insured has failed to comply with its post-loss obligations. See State Farm Mut. Auto. Ins. Co. v. Curran, 83 So. 3d 793, 803 (Fla. 5th DCA 2011) (stating that "to avoid liability under the insurance policy based on non-compliance with the [compulsory medical examination] clause, it was essential that [the insurer] plead and prove a material breach, which means a breach causing prejudice.").

20.     The court in Curran acknowledged the conflict between its opinion and De Ferrari and Goldman and certified the following issue to the Florida Supreme Court:

> When an insured breaches a CME provision in an uninsured motorist contract, (in the absence of contractual language specifying the consequences of the breach) does the insured forfeit benefits under the contract without regard to prejudice, or does the prejudice analysis described in Bankers Insurance Co. v. Macias, 475 So. 2d 1216, 1218 (Fla. 1985), apply? If prejudice must be considered, who bears the burden of pleading and proving that issue?

Id. at 807. The Florida Supreme Court has granted review of the certified question, but has not issued a ruling to date. See State Farm Mut. Auto. Ins. Co. v. Curran, 86 So. 3d 1114 (Fla. 2012).

21.     The undersigned concludes that even if Florida requires an insurer to bear the burden of showing prejudice, the defendant has met that burden with respect to the plaintiff's noncompliance with its post-loss obligations in the instant case.

22.     The plaintiff argues that the defendant has the burden "to demonstrate that it

sustained **substantial** prejudice as a result of [the plaintiff]'s asserted non-compliance with post-loss requests." See Plaintiff Biscayne Cove Condominium Association's Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 52, or Alternatively, Federal Rule of Civil Procedure 50 (DE# 151 at 10, 7/31/13) (emphasis added) (citing Ramos v. Northwestern Mutual Insurance Co., 336 So. 2d 71 (Fla. 1976)).

23.     Ramos states that an insurer will be excused from its obligation under the policy where the insured fails to cooperate, the lack of cooperation was material, the insurer suffered substantial prejudice as a result of the insured's failure to cooperate and the insurer exercised diligence and good faith in trying to bring about the insured's cooperation. Ramos, 336 So. 2d at 75.

24.     The Court finds that Ramos is factually distinguishable from the instant case. Ramos involved a third party insurance claim to recover for personal injuries filed by the victim of an automobile collision against an insurance company. The instant action is a first party claim seeking to compel appraisal to determine the amount of property damage.

25.     Moreover, the Ramos decision concerned a cooperation clause,[10] not compliance with a condition precedent. The court in Goldman observed an important

---

[10] "A cooperation clause requires the insured to cooperate with his insurer when a lawsuit is filed against him." Martin v. Commercial Union Ins. Co., 935 F.2d 235, 240 (11th Cir. 1991); see also Goldman, 660 So. 2d at 304 n.6 (stating that "[m]ost liability insurance policies contain a so-called "cooperation clause" providing that the insured shall cooperate with the insurer, shall attend hearings and trials upon the insurer's request, and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in the conduct of suits.") (citation omitted).

distinction between cooperation clauses and conditions precedent when it comes to prejudice:

> A substantial line of cases supports the rule that an insurer need not show prejudice when the insured breaches a condition precedent to suit . . . .On the other hand, if the provision is a cooperation clause, the burden would be on the insurer to demonstrate substantial prejudice before a breach would preclude recovery under the policy.

Goldman, 660 So. 2d at 303-304 (footnote and citations omitted). Thus, the Court rejects the imposition of a heightened burden on the defendant of showing "substantial prejudice."

26.     The plaintiff also argues that Ramos requires that "[i]n order to prevail on an affirmative defense asserting that a policyholder failed to comply with its post-loss obligations, the insurer must demonstrate that it exercised both diligence and good faith in bringing about the policyholder's compliance." See Plaintiff Biscayne Cove Condominium Association's Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 52, or Alternatively, Federal Rule of Civil Procedure 50 (DE# 151 at 10, 7/31/13) (citing Ramos, 336 So. 2d at 75).

27.     Ramos is inapplicable to the instant case for the reasons stated above. The plaintiff's interpretation of Ramos seeks to impose additional duties on the defendant which were not bargained for in the policy and which are not required under Florida law – i.e. requiring that the defendant exercise good faith and diligence in bringing about the plaintiff's *own* compliance with its post-loss obligations. Thus, the defendant is not required to show good faith and diligence before it can be relieved of its obligations under the policy.

28

**Pre-Suit Failure to Comply with Requests for Documents and Reinspection**

28.     The plaintiff materially breached the policy's "Duties In The Event Of Loss Or Damage" provision by failing to respond to Mr. Sansone's repeated requests for additional documents and for a reinspection of the property.

29.     The Court credits Mr. Sansone's testimony that he made these requests multiple times to Mr. Tutwiler, the plaintiff's public adjuster, and on at least two occasions[11] to Mr. Patrone, the plaintiff's property manager.

30.     The plaintiff argues that the FIU log notes dated March 2, 2007, Plaintiff's Exhibit 8, contradict Mr. Sansone's testimony that he made these requests for reinspection and for additional documents. The March 2, 2007 FIU log notes state, in part: "Our adjuster has inspected the premises and supplied initial estimate damages of $1,700,000. **We completed the inspection with the insured's public adjuster.** We had retained a roofing consultant. Our adjuster has since determined that the claim will not exceed the deductible." Plaintiff's Exhibit 8 (emphasis added). The reference to the inspection with the public adjuster refers to the 2005 inspection, since that was the only inspection that Mr. Sansone conducted. The FIU log notes do not state that Mr. Sansone received all of the information he needed for his investigation, the log notes are simply silent on this issue.

31.     The Court observed Mr. Sansone's demeanor during his in-court testimony at trial and finds him to be a credible witness. See <u>Weathers Towing, Inc. v. M/V Herman</u>

---

[11] Mr. Sansone requested documents from Mr. Patrone during the 2005 inspection and during the March 29, 2006 telephone call. He also told Mr. Patrone that he would need to reinspect the property during the March 29, 2006 telephone call.

Pott, 570 F.2d 1294, 1296 (5th Cir. 1978) (assessing the credibility of a witness is determined by the trial judge in a bench trial). The plaintiff did not present any evidence that directly contradicted Mr. Sansone's testimony that he made these requests of Mr. Tutwiler and Mr. Patrone.

32.     Mr. Sansone made specific requests for documents related to the plaintiff's loss that were not produced at any time prior to the filing of this lawsuit. Mr. Sansone did not receive permission to reinspect the property at any time prior to the filing of this lawsuit.

33.     The plaintiff's failure to respond to Mr. Sansone's repeated requests for additional documents and for a reinspection prejudiced the defendant and deprived it of "an independent means by which to determine the amount of loss, as opposed to relying solely on the representations of the insured." Romay, 744 So. 2d at 471 n.4.

34.     The plaintiff's failure to provide documents requested by Mr. Sansone and allow the reinspection of the property in 2006 deprived the defendant of the right under the policy to assess the damage to the windows and sliding glass doors and determine causation. In particular, had the plaintiff produced the unit owner surveys in 2006 and allowed him to inspect the property and speak with the unit owners about the water intrusion, Mr. Sansone would have been able to investigate whether the damage to the windows and sliding glass doors was related to Hurricane Wilma.

35.     By not responding to Mr. Sansone's repeated requests for documents and reinspection, the plaintiff deprived the defendant of its contractual right to properly investigate and evaluate a claim prior to suit to avoid costly, time consuming litigation.

36.     Similarly, the defendant's replacement of the Tower Building roof without notice to the defendant deprived the defendant of the opportunity to determine whether the

30

damage to the Tower Building roof was related to Hurricane Wilma.

37.      Although the undersigned has already determined that the defendant is not required to show substantial prejudice, the prejudice arising from the plaintiff's failure to respond to Mr. Sansone's requests was substantial in the instant case.

**The POL**

38.      In its February 6, 2013 letter, the defendant requested that the plaintiff complete a POL and provided the required form.

39.      The completion of the POL was a condition precedent under the policy. See Farmer, 104 So. 3d at 1246 ("Florida courts have consistently interpreted proof of loss obligations coupled with . . . no-action clauses to be conditions precedent.").

40.      "The purpose of a proof of loss provision is to inform the insurer of facts surrounding the loss, and to afford the insurer an adequate opportunity to investigate, prevent fraud, and form an intelligent estimate of its rights and liabilities before it is obliged to pay." Id. (citing 13 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 186.22 (3d ed. 2011)).

41.      The POL submitted by the plaintiff was deficient. The POL incorporated the plaintiff's interrogatory responses which include the plaintiff's estimates for windows and sliding glass doors that were not damaged by Hurricane Wilma.

42.      Additionally, the plaintiff crossed out material language from the POL.  See 200 Leslie Condo. Ass'n, Inc. v. QBE Ins. Corp., No. 10-61984, 2013 WL 150611, at *3 (S.D. Fla. Jan. 14, 2013) (on summary judgment stating that the plaintiff's submission of a POL which contained crossed out language "preclude[d] a finding of compliance with

the policy's post-loss conditions as a matter of law.").[12]

43.     The plaintiff did not comply with the policy's POL requirement not because some language was crossed out but because: (a) the plaintiff altered the form in an effort to include a claim for undamaged property and (b) the plaintiff submitted a claim for items that were not damaged by Hurricane Wilma, including the replacement cost of every window and sliding-glass door in the building. The altered POL did not provide QBE with the information QBE requested, pursuant to the express terms of the policy.

44.     The plaintiff materially breached its post-loss obligation by failing to submit a POL that was substantially in compliance with the request provided by the defendant.

45.     The defendant was prejudiced as a result of the plaintiff's failure to comply with the POL because, to date, the defendant does not know whether the damages the plaintiff claims were directly related to Hurricane Wilma.[13]

_____

[12] The plaintiff in 200 Leslie crossed out the same language from the POL that the plaintiff in the instant case crossed out from its POL. 200 Leslie, 2013 WL 150611 at *3.

[13] In Garden-Aire Village South Condo. Ass'n, Inc. v. QBE Ins. Co., No. 10-61985-CIV, 2013 WL 864570, at *8 (S.D. Fla. Mar. 8, 2013) (findings of fact and conclusions of law), this Court determined that the plaintiff had breached its obligations under POL, but found that there was no prejudice to the defendant:

> Though the proof of loss form was unsatisfactory in that it claimed damage to all windows, the Court does not find that this prejudice is substantial. It at least put QBE in the ballpark for an upper limit on damages and an awareness of what sorts of damages it should inquire into later in its investigation. . . . Because QBE was not substantially prejudiced by the errors and overstatements in the proof of loss, it does not preclude appraisal.

Id. (footnote omitted). The undersigned respectfully disagrees. The POL submitted by the plaintiff in the instant case was tantamount to submitting no POL because it did not provide the defendant with the information it was seeking on the form.

46.     The plaintiff argues that it could not have truthfully answered the POL without crossing out some of the language in the form. However, the POL does not act as a cap on the amount of damages the plaintiff can recover under the policy. The plaintiff could have submitted a POL that contained the known damages it claimed were directly related to Hurricane Wilma and indicated to the defendant that in addition to those known damages, it was also seeking to recover items that were not directly damaged by Hurricane Wilma under the 30 percent rule.

47.     The defendant is not obligated to go to appraisal because of the plaintiff's material breach of its obligation to provide a POL.

**Failure to Provide  Inventories of Damaged and Undamaged Property**

48.     The plaintiff also breached the policy's "Duties In The Event Of Loss Or Damage" provision by failing to provide inventories of damaged and undamaged property.

49.     The submission of inventories of damaged and undamaged property is a condition precedent under the policy.

50.     The Court rejects the plaintiff's argument that the policy provisions related to complete inventories of the damaged and undamaged property apply only to claims involving personal property. See Plaintiff Biscayne Cove Condominium Association's Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 52, or Alternatively, Federal Rule of Civil Procedure 50 (DE# 151 at 10-13, 7/31/13).

51.     "Under Florida law, insurance contracts are to be construed 'in accordance with the plain language of the policies as bargained for by the parties.'" State Nat. Ins. Co. v. White, 482 F. App'x 434, 438 (11th Cir. 2012) (per curiam) (quoting Auto-Owners Ins.

Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000)).

52.     "[A]ny ambiguity [in the insurance contract] is strictly construed against the

drafter and liberally in favor of the insured." Farmer, 104 So. 3d at 1246 (citations

omitted).

53.     The "courts should read each policy as a whole, endeavoring to give every

provision its full meaning and operative effect." Auto-Owners Ins. Co. v. Anderson, 756

So. 2d 29, 34 (Fla. 2000) (citations omitted).

54.     In the instant case, the plain language of the policy requires complete inventories

of damaged and undamaged property:  "At our request, give us complete inventories of

the damaged and undamaged property.  Include the quantities, costs, values and

amount of loss claimed."

55.     The policy's inventories requirement is not limited to personal property.  The

Court declines to insert the word "personal" before "property" and thereby change the

meaning of the policy. Although the term "personal property" appears multiple times in

the policy, it does not appear in the inventories requirement.

56.     The absence of the word "personal" from the inventories requirement for

"complete inventories of damaged and undamaged property" reflects its purposeful

omission from that section. See USAA Cas. Ins. Co. v. Gordon, 707 So. 2d 1185, 1187

(Fla. 4th DCA 1998) (finding that "the bifurcated structure of the . . . policy and the

conspicuous absence of a severability clause in Section I unambiguously reflects its

purposeful omission from that section."); Brown v. Travelers Ins. Co., 649 So. 2d 912,

914 (Fla. 4th DCA 1995) (stating that "when a carrier has such freedom over the

coverages it will insure, the nonpresence of expressed intentions on discrete subjects

34

should ordinarily be taken as purposeful non-inclusion of the intention.").

57.     Of note, the policy also contains the following provision: "Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records."

58.     Applying the construction proposed by the plaintiff of limiting the "inventories of the damaged and undamaged property" to personal property would lead to an absurd result because, by their nature, items of personal property would not be subject to sampling. See AAA Life Ins. Co. v. Nicolas, 603 So. 2d 622, 624 (Fla. 3d DCA 1992) ("The law is clear that if one interpretation of an insurance policy viewed with other provisions of the policy and its general object and scope, would lead to an absurd conclusion, that interpretation must be abandoned and one consistent with reason and probability adopted.").

59.     The defendant was prejudiced by the plaintiff's failure to provide inventories because, to date, it does not know how many or which of the plaintiff's windows and sliding glass doors were damaged as a result of Hurricane Wilma.

60.     The defendant was also prejudiced by the plaintiff's failure to provide inventories because it was forced to spend considerable funds on inspections that were broader in scope than it otherwise would have conducted.

61.     The Taylor Contracting and Roofing and WindReady, Inc. estimates are insufficient to satisfy the policy's provisions related to "complete inventories of the damaged and undamaged property." The estimates were broad estimates that were all inclusive and do not identify which windows and sliding glass doors suffered direct, physical damage from Hurricane Wilma.

35

62.     The plaintiff's failure to identify the windows and sliding glass doors it claimed were damaged by Hurricane Wilma caused the defendant to undergo a lengthy, expensive and unnecessary review of nearly all of the windows and sliding glass doors at the property and resulted in prejudice to the defendant.

63.     The Court rejects the plaintiff's argument that the defendant was not prejudiced by the plaintiff's actions because the defendant issued a Rule 34 request for entry upon land seeking access to all individual condominium units and common areas before its February 6, 2013 letter requesting inventories of damaged and undamaged property. The defendant propounded the Rule 34 request for entry upon land because the Taylor Contracting and Roofing and WindReady, Inc. estimates produced in January 2012 did not specify which windows and sliding glass doors suffered direct, physical damage from Hurricane Wilma.

64.     Finally, the plaintiff's offer to conduct a joint inspection with Mr. Moore is insufficient to cure the prejudice to the defendant, because the defendant has already incurred the cost of the first inspection.

65.     The defendant is not obligated to go to appraisal because of the plaintiff's material breach of its obligation to provide inventories of damaged and undamaged property.

**The EUOs**

66.     An examination under oath is a condition precedent under the policy. Goldman v. State Farm Fire Gen. Ins. Co., 660 So. 2d 300, 304 (Fla. 4th DCA 1995) (stating "[w]e conclude that the policy provisions requiring [the insureds] to submit to examinations under oath are conditions precedent to suit rather than cooperation clauses.").

36

67.     On February 6, 2013, the defendant made a request for an EUO. The

defendant's request delineated eight areas of inquiry which were reasonably related to

the plaintiff's claim. See Plaintiff's Exhibit 18 at 3.

68.     The plaintiff presented Ms. Giardiello and Mr. Gross in response to the

defendant's request for an EUO.

69.     Ms. Giardiello did not do anything to prepare herself for her EUO and did not

know why Mr. Tutwiler was terminated or how much he was being paid. She did not

know if the defendant had even inspected the property in 2005 or 2006.

70.     Mr. Gross admittedly did not review any documents to prepare himself for his

EUO. He did not have any information about: (1) roof problems pre-dating Hurricane

Wilma; (2) the roof replacements; (3) the first meeting with Mr. Moore; (4) an engineer

report dated a few weeks before Hurricane Wilma; (5) repairs to the "07" line or

payment for those repairs; (6) the scope of the special assessment; (7) unrepaired

damages; (8) the amount of the plaintiff's claim; (9) who determined whether every

window and sliding-glass door needed replacement; (10) whether appraisal had been

demanded or (11) pre-litigation inspections.

71.     The Court rejects the plaintiff's argument that a person who testifies in an EUO is

not obligated to prepare or otherwise have information. See Goldman, 660 So. 2d at

305 (stating that "an insured has a duty to volunteer information related to the claim

during an examination under oath in accordance with the policy while he would have no

such obligation in a deposition."); see Jacobs v. Nationwide Mut. Fire Ins. Co., No. 97-

1485-CIV, 2002 WL 34543222, at *7 (S.D. Fla. Sept. 10, 2002) (stating that an

insured's "inability and/or refusal to answer questions about their claim constitutes a

37

failure to submit to a meaningful examination under oath" and "makes th[e] process meaningless.").

72.     In <u>Jacobs</u>, the insured did not know whether an estimate was accurate, the specifics of the claim and how much of the claim was for recurring damage. <u>Id.</u> This Court concluded that, "if [insureds] cannot meaningfully answer questions regarding their claimed loss, then they must provide the insurance company with someone who can." <u>Id.</u>

73.     The plaintiff purposely presented two witnesses who were not prepared for the EUOs. <u>See</u> <u>Jacobs</u>, 2002 WL 34543222, at 7 ("The Court does not expect the [p]laintiffs to be appraisers themselves, however, if they cannot meaningfully answer questions regarding their claimed loss, then they must provide the insurance company with someone who can."). The plaintiff's refusal to produce a witness who could respond to the EUO categories enumerated in the defendant's February 6, 2013 letter amounted to a willful disregard of the plaintiff's post-loss obligation under the policy.[14]

74.     The witnesses' deficient preparation prejudiced the defendant's ability to investigate the claim, acquire information or verify the validity of the Taylor Contracting and Roofing and WindReady, Inc. estimates.

75.     The plaintiff argues that the defendant cannot show prejudice because FIU's adjuster, Andrew Bertucci, did not read the transcripts of the EUOs of Ms. Giardiello

---

[14] The Court rejects the plaintiff's argument that it offered to produce additional witnesses for an EUO. The email cited by the plaintiff to support this argument, Plaintiff's Exhibit 4, shows that the drafter of the email was unaware that Ms. Giardiello and Mr. Gross's EUOs had already taken place. Thus, the email does not show an offer by the plaintiff to produce *additional* witnesses for EUO.

and Mr. Gross. The Court rejects this argument because at the time these EUO were

taken, the defendant was represented by counsel and counsel was present at those

EUOs. In its letter denying coverage, FIU specifically mentioned the EUOs and how

they were deficient. See Defendant's Exhibit 6. Thus, although Mr. Bertucci did not read

the EUOs, counsel or someone at FIU must have read them in order to draft the denial

of coverage letter.

76.     The Court concludes that Ms. Giardiello and Mr. Gross' lack of preparation and

knowledge was so deficient that the plaintiff failed to comply with the EUO requirement

under the policy.

77.     The plaintiff's failure to comply with the EUO requirement materially breached

the policy.

78.     The Court finds that the defendant is not obligated to go to appraisal because of

the plaintiff's failure to comply with its post-loss obligation to submit to an EUO.

**Fraud, Misrepresentation and Concealment**

79.     The policy contains the following provision:

### A. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Part is void in any case of fraud by you as it
relates to this Coverage Part at any time. It is also void if you or
any other insured, at any time, intentionally conceal or
misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

See Plaintiff's Exhibit 16.

80.     The defendant has failed to carry its burden of proof on the defense of fraud,

39

misrepresentation and concealment.

81.     In Florida, the elements of fraud are the following: "(1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing . . . [that party] to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representations; and (5) resulting damage." Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp., 750 F. Supp. 2d 1346, 1349 (S.D. Fla. 2010) (citing Nova Hills Villas Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co., No. 07-60939, 2008 WL 179878, at *3 (S.D. Fla. Jan. 21, 2008)).

82.     When a claim of fraud arises in the insurance context, the insurer does not need to "demonstrate that it relied on the insured's misrepresentations when asserting a policy defense based on fraud; that a material fraud was perpetrated by an insured in pursuing an insurance claim is sufficient." Id. (citing Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 923 (11th Cir. 1998).

83.     The plaintiff's position – that it is entitled to the replacement of all windows and sliding glass doors, including undamaged windows and sliding glass doors – is based on its appraiser/public adjuster Rick Moore's opinion that more than 30 percent of its windows and sliding glass doors were damaged and the applicable building code contains a "30 percent rule" that would require that all of the property's windows and sliding glass doors be brought into compliance with the current code mandating the use of hurricane impact glass. The plaintiff further believes that different provisions of the subject policy, including provisions under the "Valuation" and "Law and Ordinance - Coverage 'A'" entitle it to recover benefits for the repairs to the undamaged windows and sliding glass doors.

40

84.     At trial, the defendant presented the testimony of its expert Dan Lavrich, a licensed engineer. Mr. Lavrich opined that there is no 30 percent rule that applied to the property on October 24, 2005.

85.     The parties' disagreement with respect to the existence of a 30 percent rule represents a difference of opinion and is not evidence of fraud, misrepresentation or concealment by the plaintiff.

86.     The plaintiff disclosed to the defendant that its claim includes undamaged windows and sliding glass doors based on its belief that the 30 percent rule applies in the instant case.

87.     Similarly, the parties' disagreement as to whether Coverage A, Coverage B or Coverage C apply to the plaintiff's claimed damages in the instant case represents a difference in the parties' interpretation of the policy and not evidence of fraud, misrepresentation or concealment by the plaintiff.

88.     The Court rejects the defendant's argument that Ms. Giardiello's signing of the 2011 application to Citizens Property Insurance Corporation is evidence of fraud against the defendant.

89.     The Court finds no evidence that the plaintiff committed fraud, misrepresentation or concealment with respect to its Hurricane Wilma claims.

## **CONCLUSIONS**

The plaintiff materially breached the policy by failing to comply with its post-loss obligations. The defendant was prejudiced by the plaintiff's non-compliance with its post-loss obligations both prior to filing this lawsuit and in 2013. The defendant failed to meet its burden of proof on the defense of fraud, misrepresentation and concealment.

Accordingly, the Court finds that:

1.      The defendant, QBE INSURANCE CORPORATION, is entitled to judgment in its

favor and against the plaintiff, BISCAYNE COVE CONDOMINIUM ASSOCIATION, INC.

2.      The Plaintiff Biscayne Cove Condominium Association's Motion for Judgment as

a Matter of Law Pursuant to Federal Rule of Civil Procedure 52, or Alternatively,

Federal Rule of Civil Procedure 50 (DE# 151, 7/31/13) is **DENIED as moot**.

3.      Final Judgment will be entered by separate order, in accordance with Fed. R.

Civ. P. 58.

         DONE AND ORDERED in Chambers at Miami, Florida this **30th** day of August,

2013.

                                                    _____
                                                    JOHN J. O'SULLIVAN
                                                    UNITED STATES MAGISTRATE JUDGE

Copies to:
All counsel of record